# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ALFRED ROMERO,

        Plaintiff,

v.                                           CIV No.01-506 MV/LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff Alfred Romero ("Romero") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Romero was not eligible for benefits under the Social Security Act. Romero moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 6.]

Romero was born on May 29, 1953 and was 45 years old when the administrative hearing was held. He has an eleventh grade education and earned his G.E.D. He previously worked as a heavy equipment operator, concrete finisher, form setter and truck driver. He contends that he became

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

disabled on April 17, 1997, after he suffered an injury to his back while he was at work in February 1997. Romero alleges that he has not been able to work since April 17, 1997, due to the effects of the back injury and a herniated disc.

Romero applied for benefits on July 31, 1997. [Tr. at 40.]. His application was denied at the initial and reconsideration stages, and he sought timely review from an Administrative Law Judge ("ALJ"). An administrative hearing was held on January 13, 1999, in Clovis, New Mexico. In a decision, dated August 24, 1999, ALJ William F. Nail found that Romero was not disabled within the meaning of the Social Security Act ("the Act") and denied the benefit request. Romero challenged this determination to the Appeals Council which denied his request for review on March 9, 2001. This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

it "significantly limits his physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, he is capable of performing other work.[9] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. In this case, the ALJ utilized a vocational expert at the hearing.

---

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After carefully reviewing Romero's medical records, symptoms and complaints, Judge Nail rejected Romero's claim for benefits at step five, concluding that there were light level jobs in the

regional and national economy that Romero could perform. (Tr. at 15-16.) In reaching this decision, the ALJ considered the testimony of the Vocational Expert ("VE") and made the following findings: (1) Romero had not engaged in substantial gainful activity after his alleged onset date; (2) Romero had a "severe" impairment or combination of impairments that included rotator cuff tear of the left shoulder; coronary artery disease, status post by-pass surgery; spinal stenosis at L3-L4; degenerative disc disease at L3-L4, L4-L5, status post laminotomy (operation of dividing the lamina of a vertebra); and, angina by history; (3) Romero's impairments did not meet or equal any of the Listings, including specifically the requirements under § 1.05(C) or any other musculoskeletal listing; (4) Romero was unable to return to his past relevant work; and (5) Romero retained a RFC for work at a light level of exertion. [Tr. at 12-16.]

Judge Nail also found that Romero's subjective complaints and functional limitations, including pain, were not supported by the evidence as a whole. [Tr. at 13.] The burden shifted to the Commissioner at step five to show that Romero's age, education, work experience and RFC would permit him to successfully adapt to a significant number of jobs available in the regional and national economy and that there were jobs existing in significant numbers in the regional and national economy that Romero could perform. In deciding that Romero could perform certain other kinds of work and that such work was available, the ALJ concluded that Romero was not disabled within the meaning of the SSA.

In this appeal, Romero asserts that the case must be reversed and remanded because Judge Nail erred by finding Romero's impairments did not meet or equal a listing and by finding Romero's subjective complaints lacked credibility. Romero also contends that the ALJ erred in his RFC finding and in concluding that other work existed that Romero could perform. [Doc. 7, p. 3.] The

Commissioner claims the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations. [Doc. 8.]

After a review of the entire record, this Court agrees that there was substantial evidence to support the ALJ's findings that Romero's impairments did not meet or equal a listing, but disagrees that the ALJ "closely and affirmatively linked" his credibility findings to substantial evidence. Therefore, the case will be remanded for further credibility findings, and the Court does not reach Plaintiff's additional arguments for remand.

## Summary of Romero's Medical Care/Conditions

On February 17, 1997, Romero was driving a front end loader to a job site when he injured his back[11] after hitting a bad spot in the road that jarred him. He visited the emergency room on that date complaining of pain across his back and numbness in both legs. [Tr. at 131.] On February 19, 1997, Romero was seen by Dr. Donald Brown, who found that he had equal muscle strength in his lower extremities and that he had no numbness on that date. Romero's "neurosensory" was intact. [Tr. at 115.] An x-ray taken on February 17 showed that the spaces between his discs were normal and that he had mild degenerative changes in the lumbar spine. [Tr. at 134.]

On February 24, 1997, he was given a trigger point injection which relieved the pain some. [Tr. at 114.] Romero's neurosensory in the lower extremities was equal. His reflexes were symmetrical, and his muscle strength and tone were equal bilaterally. An MRI taken on February 27, 1997, showed "borderline spinal stenosis" (narrowing) and mild degeneration in several discs but that

---

[11]Romero suffered a back injury about eight years prior to February 1997 but had no problems with his back since that earlier injury. [Tr. at 115.]

no nerve roots were impinged then.  [Tr. at 114, 130.]  On February 28, Romero told Dr. Brown's nurse that his back pain was better.  He was referred to physical therapy.  [Tr. at 114.]

On March 10, 1997, Dr. Diskland, an occupational specialist, saw Romero at the request of Workers' Compensation.  Dr. Diskland noted that, according to Romero, physical therapy had helped dramatically and that Romero was feeling better.  He could sit for 3 ½ to 4 hours while driving to the appointment and he could squat, hop and walk.  He had normal strength in his lower extremities.  The x-rays showed no narrowing and one bulging disc, some disc degeneration and spinal stenosis.  Romero had "mild limitation of lumbar extension" due to pain and would have been given an impairment rating of 5% although he was not at maximum medical improvement yet.  Romero had not developed "true radiculopathy" (disease of the nerve roots).  His reflexes were equal and his sensory exam was within normal.  Dr. Diskland expected Romero would be able to return to work with more physical therapy and did not think he needed surgery.  However, Dr. Diskland did not recommend that Romero return to the same heavy equipment work.  Instead, Romero should return to work in light duty.  [Tr. at 116-122.]

At physical therapy the next day, Romero complained of pain relating to his drive to the appointment with Dr. Diskland.  [Tr. at 190.]  During subsequent physical therapy sessions, Romero complained he was a little sore in his lower back or that he had minimal aching pain but the therapy seemed to be helping the pain.  [Tr. at 181-83.]

On March 24, 1997, Dr. Reeve saw Romero.  He noted that the x-ray showed a "severe disc bulge" but that there was no atrophy or neural encroachment.  Romero reported that physical therapy was helping.  There was no weakness on ambulation and no abnormality with his gait.  He had normal

motor strength and the straight leg raise was negative (indicating no pain). Dr. Reeve recommended that Romero return to light duty situation with a driving restriction. [Tr. at 150.]

From about March 24 until April 17, 1997, it appears that Romero returned to work. [Tr. at 66.] However, he was doing a lot of driving at work and was experiencing more back pain. [Tr. at 206.] His employer apparently sent Romero home in April 1997 after he complained of back pain while driving. [Tr. at 148.] On April 24, 1997, Dr. Reeve saw Romero again and noted "possible radicular findings." Romero's reflexes were intact and he had a positive straight leg raise on the left extremity (indicating related back pain). Dr. Reeve recommended that he could perform light duty work but with a driving restriction. [Tr. at 187.]

Romero's April and May physical therapy records show generally the same complaints of minimal lower back pain and some left knee pain. [Tr. at 198-205.] On May 16, 1997, the physical therapist noted that Romero continued to complain of minimal dull aching to an occasional sharp pain in his lower back, as well as pain to his left knee. Romero was temporarily relieved of the symptoms after each session for a few hours. [Tr. at 189.]

On May 22, 1997, Dr. Reeve again found Romero's reflexes were intact, no atrophy and a positive straight leg raise for the left leg. Romero was taking Darvocet for pain. Dr. Reeve did not think he was a candidate for surgery and thought that perhaps Romero was exaggerating some of his pain symptoms. [Tr. at 147.]

At physical therapy sessions in May and June, Romero continued to complain of pain in his lower back. [Tr. at 192-99.] On June 14, 1997, Dr. Reeve saw Romero, and Romero became "extremely angry" regarding the impairment of 5 to 10% that Dr. Reeve was suggesting might apply then. Romero told Dr. Reeve that his "back was worth more." Darvocet was controlling Romero's

pain, and Dr. Reeve noted that Romero sat comfortably during this exam which lasted an hour. Dr. Reeve was unable to conduct the EMG/nerve conduction study because the discussion with Romero lasted too long that day. Dr. Reeve also indicated that Romero had been released to light work, with a driving restriction, but that Romero's employer could not accommodate him apparently. [Tr. at 145.]

On July 3, 1997, Dr. Reeve completed the EMG/nerve conduction study to rule out radiculopathic features. The results were normal. Dr. Reeve felt that Romero had reached maximum medical improvement and that he was ready for a functional capacity evaluation. [Tr. at 143.]

On July 31, 1997, Romero applied for social security benefits. [Tr. at 40.] In the disability report, filled out by Romero on July 26, he asserted that he was always in pain from his back injury, sciatica and herniated disc and also that he believed the doctors were biased on the side of Workers' Compensation. [Tr. at 66.]

On August 25, 1997, Dr. Reeve noted that Romero did not have an obvious course of radiculopathy, but that the MRI showed he had a "severe disc bulge" at L3-L4. His report also indicated that this was "probably not clinically significant." Romero had paraspinal spasms and his reflexes were intact. The functional capacity assessment showed that light duty work was warranted. Dr. Reeve stated that Romero was on permanent light duty and that he had a 5% impairment rating as previously predicted. [Tr. at 141.]

On September 25, 1997, Dr. Mario Gutierrez saw Romero for the first time, at the request of Romero's attorney. Dr. Gutierrez observed that Romero's gait was antalgic (counteracting or avoiding pain) due to back and leg pain. He could not walk on his heels and tiptoes without pain. He was using a cane. His range of motion was limited due to back and leg pain. He had numbness

and weakness and a positive straight leg raise but no muscle atrophy. According to Dr. Gutierrez, Romero's 1997 x-rays were "unremarkable." The 1997 MRI showed a protruding disc that was causing "some" spinal stenosis. [Tr. at 234]. Dr. Gutierrez believed that Romero would require back surgery. [Tr. at 240.]

On October 17, 1997, a functional capacity assessment was completed by Dr. Dillon, indicating that Romero could lift 20 pounds occasionally and 10 pounds frequently. He could stand or walk for six hours, sit for six hours and had unlimited ability to push and pull. He could engage in occasional climbing, balancing and stooping. He had a 5% impairment rating. [Tr. at 154.]

On October 16, 1997, a New Mexico Disability Determinations Services Road Map was prepared that showed Romero had a severe impairment but did not meet a listing. [Tr. at 175.] His application for benefits was denied October 23, 1997. [Tr. at 22.]

On December 2, 1997, Romero had back surgery. Dr. Gutierrez noted that the surgery was uneventful and that pain medications were controlling Romero's pain. Romero had two protruding discs and spinal stenosis "to a lesser degree." Prior to surgery, he was positive for straight leg raising, he had decreased pin prick sensation, and his posture was antalgic. After surgery, he was free of lumbar radiculopathy, low back pain, lumbar stenosis and the protruding discs. [Tr. at 96, 162, 168.]

On December 15, 1997, Romero still had some low back pain and some discomfort in his left leg, which was expected at that point. [Tr. at 232.] On January 8, 1998, Romero had less low back and leg pain but still needed Percocet. His knee pain and arthritis were not related to his work. [Tr. at 231.] On January 13, 1998, x-rays for his left shoulder and left knee both were normal. [Tr. at 253, 259.] On January 26, 1998, Romero was seeing Dr. Crowley for follow up regarding his knee

and pack pain. He told Dr. Crowley that he was getting some relief from physical therapy for his pain. [Tr. at 252.]

On February 5, 1998, Dr. Gutierrez reported that Romero had made "very slow recovery and improvement if any" and that he now had complaints of knee pain. Romero had "some" muscle spasm and had not reached maximum medical improvement from the surgery. [Tr. at 230.] On February 18, Romero reported that he had improved flexibility on his lumbar spine. [Tr. at 186.] On March 5, 1998, Romero told Dr. Gutierrez that he had some pain in his knees but no more radicular pain in his legs. He was satisfied with the results of the surgery but was disheartened because of his knee and shoulder pain. [Tr. at 229.]

On April 6, 1998, the physical therapist recorded that Romero had no significant improvement in his pain level or trunk mobility. On April 16, Dr. Gutierrez reported that Romero had improved with his neck and back pain but still had some difficulty in walking and had pain in his right leg at times. Dr. Gutierrez told Romero that there was nothing more he could do for him regarding his back, that he was discharging him and that he would be reaching maximum medical improvement soon. Dr. Gutierrez believed that Romero could do light duty work as of April 20, 1998 and gave him a work release with physical limitations. He gave him one more refill on pain medications and then suggested he use over the counter pain medications in the future. [Tr. at 228, 237, 238.]

On May 6, 1998, he was seen by Dr. Lenore Herrera. He complained to her about back, wrist, shoulder and knee pain. He had problems sitting, standing or walking for more than one hour and needed help dressing. Dr. Herrera noted that his right and left legs were different in length by two inches and that his two thighs also differed by two inches in circumference. He used a cane but Dr. Herrera reported that he did not rely on it completely for assistance getting out of his chair. He

could not squat, toe-heel or tandem walk. He had tenderness without myospasm (spasmodic muscular contractions). There was no radicular component and no straight leg raising positivity. His ability to stand, walk and sit were limited by chronic back pain, stiffness and decreased range of motion, status post laminectomy (excision of the posterior arch of a vertebra). [Tr. at 210.]

On June 5, 1998, Romero received a letter from the City of Clovis terminating his job. The letter reflected that Romero had not worked since February 17, 1997 (although it appears he worked for a short time in March and April) and that he had been on FMLA leave since March 13. The City terminated him because it had no other jobs available that he could perform. [Tr. at 94.]

On July 19, 1998, Dr. Dillon filled out another Functional Capacity Assessment relating to Romero's status post laminectomy and left shoulder pain. She noted elective cane use on ambulation. He had occasional postural limitations in climbing, balancing, stooping, kneeling, crouching, and crawling. He had manipulative limitations in all directions. She stated "light duty is appropriate." [Tr. at 226.]

In July 1998, Romero began to have chest discomfort and palpitations. [Tr. at 248.] On August 26, 1998, Dr. Crowley saw him for continued back pain. Romero complained of chest pain as well. Dr. Crowley noted that Romero had been diagnosed with major depression, although there are no prior medical records showing when he was given this diagnosis or by whom. Dr. Crowley started him on an anti-depressant. [Tr. at 246.]

Dr. Velez saw Romero for his rotator cuff problem. An MRI in May 1998 showed a partial tear of his tendon. [Tr. at 250-51.] On July 23, 1998, he had rotator cuff surgery. Romero could not return to work as of August 28, 1998, due to the surgery on his shoulder. [Tr. at 96, 227.]

On August 31, 1998, Dr. Gutierrez responded to a Social Securities Questionnaire with respect to a Vertebrogenic Disorder. Dr. Gutierrez responded "yes" on the form as to whether Romero had this disorder. Dr. Gutierrez further explained that he had spinal stenosis and that he improved after surgery but still had "some difficulty standing and walking. He could do light duty or sedentary work . . . ." [Tr. at 242.]

On September 25, 1998, Romero had a coronary artery bypass graft and was discharged on September 30. [*Tr. at 244, 96, 269, 274.] On November 19, 1998, Dr. Crowley noted that Romero was still taking Darvocet for his low back pain and that he would be set up to see a pain specialist. [Tr. at 281.] Dr. Crowley summarized Romero's medical conditions on January 12, 1999. [Tr. at 267.]

The administrative hearing was held on January 13, 1999 in Clovis. [Tr. at 313.] Romero and his wife testified. Romero stated that he used the cane most of the time, he drove once or twice a week, had no hobbies, watched some TV or read, barely walked, needed help dressing and bathing, could feed himself and shave, had poor sleep, could sit 30-45 minutes at a time, could be on his feet 45 minutes at a time, could walk ½ a block, and could lift over 10 pounds with both hands. He also stated that after his heart surgery, he had to sleep in a recliner, that he had pain all the time, encountered stress and had trouble getting along with people.

As of March 17, 1999, Romero still had low back pain, was using prescription pain killers and was on an anti-depressant. [Tr. at 280.] On March 22, Romero saw Dr. Qubty for pain management. Romero was taking four Darvocet a day that helped some with his pain. Dr. Qubty found that he had

an antalgic gait, he was positive for Gower's,[12] his extremities had full range of motion except for decreased abduction on the left, his back showed marked decrease in range of motion, and he was positive for Lasegue's. [Tr. at 296.]

On April 27, 1999, Romero saw his cardiologist who reported Romero's coronary artery disease was stable. On July 26, 1999, Dr. Trance saw Romero for depression, back pain, and hypertension. Romero was still taking Darvocet and his depression was stable with the anti-depressant. [Tr. at 298, 299.]

On August 24, 1999, Judge Nail issued his decision denying Romero benefits. Prior to the August 24 decision, Romero filed a second application for benefits that eventually was granted. He began receiving benefits from August 25, 1999 forward. [Doc. 7, p. 3.]

## Discussion

### A.   *Step Three - Listings*

As stated above, Plaintiff bears the burden at step three of demonstrating his conditions meet *all of* the requirements of a listing. The medical criteria defining the listed impairments are set "at a higher level of severity than the statutory standard." Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892 (1990). The reason for this higher standard is that the "listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." Id. *See* Davidson v. Sec'y of Health and Human Servs., 912 F.2d 1246, 1252 (10th Cir. 1990) ("[T]he function of the listings is to establish a description of impairments so severe as to constitute an automatic conclusive

---

[12]Romero's attorney defines Gower's phenomenon to mean when dorsal flexion of the foot by an examiner produces pain along the entire course of the sciatic nerve. [Doc. 7, p. 6.] According to Stedman's Medical Dictionary, this definition applies to Lasegue's sign, rather than Gower's. Stedman's Medical Dictionary defines Gower's syndrome as palpitations and chest pain and Gower's disease as progressive muscular dystrophy. Lasegue's sign is defined as follows: when patient is supine with his hip flexed, dorsiflexion of ankle causing pain or muscle spasm in posterior thigh indicates lumbar root or sciatic nerve irritation.

presumption of disability." ) Accordingly, if the claimant satisfies the listing criteria, then he or she is presumed unable to work and is awarded benefits, without any further determination as to whether the individual can return to a former position or perform other kinds of work. In contrast, if the impairment is not sufficiently severe to meet the requirements of a listing, then the evaluation proceeds to step four. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Zebley, 493 U.S. at 530.

Romero initially argued that Judge Nail erred in his conclusion that Romero's impairments did not meet or equal Listings 1.05(C) (vertebrogenic disorder), 1.03(B) (arthritis of a major weight-bearing joint, due to any cause) and/or 12.06 (anxiety related disorders). However, in his reply, he concedes that 1.03(B) is inapplicable to the circumstances here.

The Court first rejects Romero's argument that the ALJ failed to give proper weight to the evidence supporting a finding that Romero met Listing 12.06. In order to show that he is entitled to an automatic conclusive presumption that Romero was disabled by an anxiety related disorder under Listing 12.06, Romero must provide objective medical evidence showing "generalized persistent anxiety" accompanied by three out of four of the following symptoms: motor tension, autonomic hyperactivity, apprehensive expectation, and/or vigilance and scanning. The Listing contains additional criteria as well, although no further analysis is required, under the facts of this case.

This is true because there is very little, if any, objective medical evidence showing the severity required by Listing 12.06. For example, Romero relies on one record, along with his own testimony at the hearing, for the conclusion that he met the requirements of 12.06. The cited record is unsigned, undated and appears to be something submitted to an Insurance Company. It also is incomplete and has been cut off at the bottom. [Tr. at 263.] Romero's counsel argues that it was submitted by Dr.

Crowley, and that Dr. Crowley concluded that Romero had a "Class 3" mental impairment ("able to engage in only limited stress situations. . . ."). None of the extensive medical documentation mentions or records any type of anxiety disorder. Romero's evidence of an anxiety related disorder falls far short of satisfying the listing criteria and need not be addressed further.

Romero's argument that he satisfied 1.05(C) presents a closer call but ultimately fails to convince the Court that Romero met his burden or that the ALJ erred in finding that Romero's impairments were not conclusively or presumptively disabling. To demonstrate that an individual is disabled under § 105(C),

> (1) the claimant must show a persistent vertebrogenic disorder; (2) the disorder must involve pain, muscle spasm, and significant limitation of motion in the spine; and (3) the disorder must involve appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

Nienhaus v. Massanari, 153 F. Supp. 2d 1274, 1279-80 (D. Kan. 2001) (*relying on* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.05(C).)

Romero argues that Dr. Gutierrez's response to a disability questionnaire is unrebutted evidence that he suffered from a vertebrogenic disorder. [Tr. at 242.] It is true that Dr. Gutierrez was Romero's treating neurosurgeon and that he filled out a questionnaire in August 1998, responding "yes" to the question of whether Romero had a vertebrogenic disorder. The questionnaire tracked the language of listing 1.05(C).

However, the form also required Dr. Gutierrez to state the reasons for his opinion, including laboratory findings and objective findings and to "explain in detail why your findings support the diagnosis; and why the medical signs and findings show a medical condition that could reasonably be expected to produce [Romero's] symptoms." [Tr. at 242.] Dr. Gutierrez wrote only "Dx. spinal

stenosis. Patient improved after surgery but still has some difficulty standing and walking. He could do light duty or sedentary work but he will need a statement from his orthopedist for the knee problem." [Tr. at 242.] Dr. Gutierrez provides no detail as to why his findings support the diagnosis or why the medical signs show a medical condition that could reasonably be expected to produce Romero's symptoms.

Indeed, Dr. Gutierrez's findings on this form are not only unexplained, they are conflicting. On one hand, the form might be read to mean that Romero is presumptively disabled under the criteria of the listing, and on the other hand, Dr. Gutierrez concludes Romero can work. His conclusion that Romero can perform light duty or sedentary work is consistent with all of the extensive objective medical documentation. No physician examining Romero determined that Romero was unable to work, other than for brief periods after a surgery.

Moreover, form reports that require a physician to check a box or fill in the blank "are weak evidence at best." Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993). "Where these so-called reports are unaccompanied by thorough written reports, their reliability is suspect." Id. The findings of other health care providers, including Dr. Gutierrez's own previous findings, further confirm the unreliability of this form questionnaire.

Romero also cites other medical and physical therapy records showing that he had spinal stenosis, his condition was chronic, radicular findings were suspected, his pain was ongoing, he had trunk immobility, muscle weakness, muscle spasms and was unable to perform squats, treadmill and bicycle isotonics. [Tr. at 130, 148, 187, 230.] He relies on Dr. Herrera's medical report in which she documented a two inch leg discrepancy and a two inch thigh circumference discrepancy. [Tr. at 211.] In addition to his back problems and pain, he was diagnosed with shoulder problems and a severe

cardiac condition, both of which required surgeries.  On March 22, 1999, Dr. Qubty saw Romero, on a single occasion, for chronic pain care and management.  Dr. Qubty recorded Romero's antalgic gait, positive Gower's, positive straight leg raise, marked decrease in range of motion and a positive Lasegue's.  [Tr. at 296-97.]

The records relied upon by Romero generally demonstrate the existence of a chronic back condition and pain.  A number of other records, however, show that Romero had "mild" degenerative changes in the lumbar spine and "borderline" spinal stenosis.  Examining physicians reported "normal strength" in his lower extremities, "normal" motor strength, "mild" limitation of lumbar extension related to pain, and only "some" disc degeneration.  [Tr. at 116, 130, 134, 150.]  While Dr. Reeve wished to rule out radicular findings, the EMG and nerve conduction study were normal.  [Tr. at 143.]

Furthermore, although Romero had positive straight leg raises, he also had negative raises, indicative of no associated pain.  [Tr. at 210.]  He had a positive Romberg with Dr. Qubty in 1999 and a negative Romberg with Dr. Herrera in 1998.  [Tr. at 210.]  He had "some" muscle spasm in February 1998, according to Dr. Gutierrez, but no physicians ever documented consistent or significant muscle spasm.  Dr. Herrera reported that Romero had tenderness without myospasm and that there was no radicular component.  [Tr. at 210.]  Dr. Herrera found different measurements of the length of his legs and circumference of his thighs, but several other doctors concluded that there was no atrophy.  [Tr. at 150, 234.]

Finally, it is notable that almost all of Romero's examining or treating physicians concluded that he was capable of light work or sedentary work.  In March 1997, Dr. Diskland believed Romero could return to light duty work .  Dr. Reeve released Romero to light duty work, with driving

limitations. [Tr. at 141.] In mid-1998, Dr. Gutierrez concluded that Romero could go to work on light duty. [Tr. at 228.] Dr. Dillon, who filled out two functional capacity assessments, found that he was capable of light duty work. [Tr. at 219.] The other examining physicians made no comment with respect to Romero's ability to work. Dr. Moss noted that Romero's coronary artery disease was stable in April 1999, and Dr. Trance reported that his depression was stable in August 1999.

Romero simply has not demonstrated "appropriate abnormal physical findings . . . to persist on repeated examinations." "Since abnormal findings may be intermittent, their continuous presence over a period of time must be established by a record of ongoing treatment." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.00(B). Romero has not satisfied his burden of showing that he suffered from muscle spasm for at least 3 months that was expected to last 12 months or that he had "radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss" for that period of time. 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.05(C). *See* Nienhaus, 153 F. Supp. 2d at 1380 (listing not met where there was evidence of slight hand tremors and a slight antalgic gait that did not reveal a significant degree of motor loss; some or a little weakness that did not satisfy requirement for muscle weakness; and no sensory deficits found); Riddle v. Halter, 10 Fed. Appx. 665, 2001 WL 282344 (10th Cir. March 22, 2001) (listing not met where no significant motor loss shown and physicians did not indicate claimant's back problems were "particularly severe"); Crawford v. Massanari, 2001 WL 1000957 (D. Kan. Aug. 23, 2001) (listing not met where medical evidence did not show muscle spasm or significant motor loss with muscle weakness). For all of these reasons, the Court concludes that the ALJ's decision that Romero did not meet a listing is supported by substantial evidence.

**B.** **_Credibility of Subjective Complaints and Functional Limitations_**

Romero argues generally that the ALJ erred by finding that his testimony regarding pain and limitations lacked credibility. Credibility is the province of the ALJ. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1499 (10th Cir. 1992). The Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir. 1991).

In Kepler v. Chater, the Tenth Circuit offered factors that an ALJ should consider in evaluating subjective allegations of pain. Kepler, 68 F.3d 387, 390-91 (10th Cir. 1995) Those factors are: (1) whether the objective medical evidence establishes a pain-producing impairment; (2) if so, whether there is a loose nexus between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, claimant's pain is in fact disabling. Id. at 390. Kepler does not require a formalistic factor-by-factor recitation of the evidence. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). However, the ALJ must set forth specific evidence he relies on in evaluating the claimant's credibility. Findings as to credibility should be closely and affirmatively linked to substantial evidence rather than a conclusion in the guise of findings. Kepler, 68 f.3d at 391. In making such findings, the ALJ need not totally accept or reject the claimant's statements. SSR 96-7p.

Some of the factors to consider regarding a claimant's credibility as to complaints of disabling pain are:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequence of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other

witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir. 1988).

In his decision, Judge Nair stated briefly that Romero's "testimony of subjective complaints and functional limitations, including pain, was not supported by the evidence as a whole to the disabling degree alleged and, therefore, lacked credibility." [Tr. at 13.] The ALJ then recounted some of Romero's testimony, including that the medications Romero took made him drowsy and dizzy, he drove very little, he sometimes was forgetful and he engaged in minimal daily living activities, except for his own personal hygiene. Judge Nair also summarized Romero's testimony regarding his physical limitations, including the assertion that he had back pain all the time. [Tr. at 14.] Judge Nair concluded that "[t]o the extent that the claimant's testimony regarding his physical limitations might suggest he is incapable of any work, I do not find it credible." [Tr. at 15.]

While aware of the deference the Court must pay to the ALJ's credibility determinations, in this case, the ALJ has not set out any reasons explaining why he discredited Romero's subjective complaints, nor did he specifically address any of the factors set out above. For example, to the extent that Judge Nail found discrepancies between Romero's testimony and the objective medical evidence, he did not identify those discrepancies. In addition, Judge Nail did not discuss any of his observations of Romero at the hearing, with respect to whether Romero sat comfortably through the hearing or exhibited any signs of pain. He did not mention if he found some of Romero's complaints to be exaggerated or any reasons supporting such a finding. In sum, the ALJ did not appear to have linked his determination of credibility to specific findings of facts in evidence that are fairly derived from the record.

The Court recognizes that the ALJ is free to find Romero's testimony not credible, but he still must give the reasons for that finding. *See* O'Neal v. Barnhart, ___F.3d ___, 2002 WL 244843 at *3 (10th Cir. Feb. 21, 2002) (internal citations omitted) (remand warranted because of the ALJ's conclusory fashion of discrediting claimant's testimony); *compare* Corber v. Massanari, 20 Fed. Appx. 816, 2001 WL 1203004 (10th Cir. Oct. 11, 2001) (ALJ specifically found the claimant's complaints of pain to be exaggerated and inconsistent with objective medical history, and the ALJ linked his determination of credibility to specific findings of fact in evidence); Vinson v. Massanari, 155 F. Supp. 2d 1277, 1284 (D. Kan. 2001) (the ALJ painstakingly detailed his reasons for discrediting the claimant's subjective complaints); White v. Massanari, 271 F.3d 1256, 1261 (10th Cir. 2001) (the ALJ carefully set forth the reasons supporting his negative credibility assessment, including his observations of the claimant at the hearing). Because the ALJ did not specifically discuss why he concluded that some or most of Romero's subjective complaints lacked credibility, the Court is unable to determine whether substantial evidence supports the credibility findings. Therefore, this case will be remanded for the purpose of making credibility findings consistent with this decision, and for any further proceedings that the ALJ finds necessary in light of this remand.[13]

---

[13]Because the Court is remanding so that the ALJ can make credibility determinations which could affect the step four and/or five findings, the Court does not reach Romero's arguments that the ALJ erred in concluding that Romero retained the RFC to perform light level or sedentary work and that other work was available that he could perform.

**<u>Recommended Disposition</u>**

That Plaintiff's Motion to Reverse and Remand [doc. 6] be granted and the case remanded to the Commissioner for further consideration of Romero's credibility as to allegations of pain and limitations, and for any further proceedings that are necessary, in accordance with this opinion.

_____
Lorenzo F. Garcia
United States Magistrate Judge